Bernard SAMOFF, Regional Director of the Fourth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 107, HIGHWAY TRUCK DRIVERS AND HELPERS, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, et al., Respondents.

Civ. A. No. 34209.

United States District Court E. D. Pennsylvania.

Dec. 9, 1963.

James M. Fitzpatrick, Atty., N. L. R. B., Philadelphia, Pa., for petitioner.

David Previant, Milwaukee, Wis., Howard S. Simonoff, Camden, N. J., Richard H. Markowitz, Philadelphia, Pa., for Locals 107, 312, 331, 384, 470 and 676, International Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers, respondents.

John C. Peet, Jr., Philadelphia, Pa., Morgan, Lewis & Bockius, of counsel, Philadelphia, Pa., for Delaware County Labor Relations Assn., Delaware Valley Labor Relations Assn. and Schuylkill Valley Labor Relations Assn.

M. Kalman Gitomer, Philadelphia, Pa., for Private Carriers Assn., Local Cartage Assn., and South Jersey Transport Assn. Inc.

KRAFT, District Judge.

This cause came on to be heard upon the verified petition of Bernard Samoff, Regional Director of the Fourth Region of the National Labor Relations Board (herein called the Board), for a temporary injunction pursuant to Section 10($l$) of the National Labor Relations Act, as amended (herein called the Act), pending the final disposition of the matters involved herein pending before the Board, and upon issuance of an order to show cause why injunctive relief should not be granted as prayed in said petition. Respondents filed answers to said petition. A hearing on the issues raised by the petition and answers was duly held on November 4, 1963. All parties were afforded full opportunity to be heard, to present evidence bearing on the issues, and to argue on the evidence and the law. No testimony was taken but the parties have filed a stipulation of fact,

and certain exhibits were received in evidence. The Court has fully considered the petition, answer, stipulation, exhibits, arguments, and briefs of counsel. Upon the entire record, the Court makes the following:

## FINDINGS OF FACT.

1. Petitioner is Regional Director of the Fourth Region of the Board, an agency of the United States, and filed this petition for and on behalf of the Board.

2. On or about June 3, 1963, Peter D. Walther and Joseph T. Wendling, pursuant to the provisions of the Act, filed charges with the Board alleging that Local 107, Highway Truck Drivers and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 312, Chauffeurs, Teamsters and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 331, Chauffeurs, Teamsters and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 384, Truck Drivers, Chauffeurs and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 470, General Teamsters, Chauffeurs and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 676, Truck Drivers and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (herein called Locals 107, 312, 331, 384, 470 and 676, respectively and collectively called respondent unions), labor organizations, and Delaware County Labor Relations Association; Delaware Valley Labor Relations Association; Schuylkill Valley Labor Relations Association; Private Carriers Association; Local Cartage Operators Association and South Jersey Transport Association, Inc. (herein called Delaware County, Delaware Valley, Schuylkill Valley, Private Carriers, Local Cartage and South Jersey Associations, respectively and collectively called

respondent associations), employers' associations, have engaged in, and are engaging in, an unfair labor practice within the meaning of Section 8(e) of the Act.

3. The aforesaid charges were referred to petitioner as Regional Director of the Fourth Region of the Board.

4. There is, and petitioner has reasonable cause to believe that:

(a) Respondent unions, unincorporated associations, are organizations in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(b) Locals 107 and 470 maintain their principal offices at Philadelphia, Pennsylvania; Local 312 maintains its principal office at Chester, Pennsylvania; Local 331 maintains its principal office at Atlantic City, New Jersey; Local 384 maintains its principal office at Norristown, Pennsylvania; and Local 676 maintains its principal office at Camden, New Jersey. At all times material herein all respondent unions have been engaged within this judicial district in transacting business and in promoting and protecting the interests of their employee members.

(c) Respondent associations are associations of employers engaged in the trucking industry in the Philadelphia and southern New Jersey areas. Some of respondent associations, including respondents Delaware County, Delaware Valley and Schuylkill Valley, have combined together to form the Tri-Area Labor Association. In the operations of their businesses, which constitute links in the transportation of goods in commerce, employer members of respondent associations annually receive or transport goods and materials from outside the state in which they are located valued at in excess of $50,000, and annually transport products shipped outside the state in which they are located valued at in excess of $50,000.

(d) The associations referred to in subparagraph (c) above, on behalf of their employer members engage in collective bargaining with respondent unions. On or about May 21, 1963, respondent unions and respondent associations on behalf of their employer members entered into contracts containing the following clauses:

"ARTICLE 1
"Scope of Agreement
"Section 2. Employees covered

* * *

"(c) In all cases, hired or leased equipment shall be operated by an Employee of the certificated or permitted carrier and such Employee shall be paid pursuant to the terms of this Agreement. The Employer expressly reserves the right to control the manner, means and details of, and by which the Owner-operator performs his services, as well as the ends to be accomplished.

"ARTICLE 23
"Owner-Operators
"Effective July 1, 1963
"Section 1.

"Owner-Operators (see note), other than certificated or permitted carriers, shall not be covered by this Agreement unless affiliated by lease with a certificated or permitted carrier which is required to operate in full compliance with all the provisions of this Agreement and hold proper ICC and state certificates and permits. Such Owner-Operators shall operate exclusively in such service and for no other interests.

"(Note: Whenever 'Owner-Operator' is used in this article, it means owner-driver only, and nothing in this article shall apply to any equipment leased except where Owner is also employed as a driver.)

"Section 2.

"This type of operator's compensation for wages and working conditions shall be in full accordance with all the provisions of this Agreement. The Owner-Operator shall have seniority as a driver only, provided, however, that owner-drivers shall not bump onto company equipment except where a vacancy occurs or the company adds additional equipment in which event he may bump onto such equipment, provided further that if he does so bump he shall go to the bottom of the seniority roster for work preference but shall have seniority from original date of hire for purposes of layoff and all other contract benefits. In the event of layoff he shall exercise his seniority from his original date of hire. After bumping as provided above, he shall accumulate seniority for all work preferences from the date of bumping onto company equipment.

"Section 3.

"Certificate and title to the equipment must be in the name of the actual owner.

"Section 4.

"In all cases, hired or leased equipment shall be operated by an employee of the certificated or permitted carrier. The Employer expressly reserves the right to control the manner, means and details of, and by which, the Owner-Operator performs his services, as well as the end to be accomplished.

"Section 5.

"Certificated or permitted carriers shall use their own available equipment, together with all leased equipment under minimum thirty-day (30) bona fide lease arrangements, on a rotating board, before hiring any extra equipment.

"Section 6.

"Separate checks shall be issued by the certificated or permitted carriers for driver's wages and equipment rental. At no time shall the equipment checks be for less than actual miles operated. Separate checks for drivers shall not be deducted from the minimum truck

rental revenue. The driver shall turn in time direct to the certificated or permitted carrier. All monies due the Owner-Operator may be held no longer than two (2) weeks, except where the Lease of Equipment Agreement is terminated and in such case all monies due the operator may be held no longer than thirty (30) days from the date of the termination of the operation of the equipment.

"*Section 7.*

"Payment for equipment service shall be handled by the issuance of a check for the full mileage operated, tonnage or percentage, less any agreed advances. A statement of any charges by the certificated or permitted carrier shall be issued at the same time, but shall not be deducted in advance.

"*Section 8.*

"The Owner-Operator shall have complete freedom to purchase gasoline, oil, grease, tires, tubes, etc., including repair work, at any place where efficient service and satisfactory products can be obtained at the most favorable prices.

"*Section 9.*

"There shall be no deduction pertaining to equipment operation for any reason whatsoever.

"*Section 10.*

"The Employer or certificated or permitted carrier hereby agrees to pay road or mile tax, social security tax, compensation insurance, public liability and property damage insurance, bridge tolls, fees for certificates, permits and travel orders, fines and penalties for inadequate certificates, license fees, weight tax and wheel tax, and for loss of driving time due to waiting at state lines, and also cargo insurance. It is expressly understood that the owner-driver shall pay the license fees in the state in which title is registered.

"All tolls no matter how computed must be paid by the Employer regardless of any agreement to the contrary.

"All taxes or additional charges imposed by law relating to actual truck operation and use of highways, no matter how computed or named, shall be paid by the carrier, excepting only vehicle licensing as such, in the state where title is registered.

"*Section 11.*

"There shall be no interest or handling charge on earned money advanced prior to the regular pay day.

"*Section 12.*

"(A) All certificated or permitted carriers hiring or leasing equipment owned and driven by the owner-driver shall file a true copy of the Lease Agreement covering the owner-driven equipment with the Joint Area Committee. The terms of the lease shall cover only the equipment owned and driven by the owner-driver and shall be in complete accord with the minimum rates and conditions provided herein, plus the full wage rate and supplementary allowances for drivers as embodied elsewhere in this Agreement.

"(B) The minimum rate for leased equipment owned and driven by the owner-driver shall be:

"Single Axle,
    "Tractor only .....10½¢ per mile
"Tandem Axle,
    "Tractor only......11¢ per mile
"Single Axle,
    "Trailer and 35 to 40
    foot tandem trailer  4¢ per mile
    (with $8.00 minimum daily guarantee.)
"Tandem Axle,
    "40 foot or over,
    "Trailer only .......5¢ per mile
    (with $10.00 minimum daily guarantee.)

"Minimum daily guarantee for trailers does not apply to Saturday,

Sunday or holidays, it applies to either the first day or last day of use, but not both.

"The above rates also apply to deadheading.

"The above rates are based on twenty-three thousand pounds (23,-000) load limit for single axle tractors and twenty-seven thousand pounds (27,000) load limit for tandem axle tractors.

"On load limits over twenty-three thousand pounds (23,000) there shall be ½¢ additional per mile for each one thousand pounds (1,000) or fraction thereof in excess of twenty-three thousand pounds (23,-000).

"There shall be a minimum guarantee of twenty-five thousand pounds (25,000) for leased single axle tractors and twenty-seven thousand pounds (27,000) for leased tandem axle tractors owned and driven by the owner-driver.

"During the first year of a lease, there shall be a minimum guarantee of $100 a month for rental of single axle tractors unless the lease is terminated by mutual agreement or for just cause (which does not include lay-off). There shall be an offset against such minimum monthly guarantee to the extent that rental income exceeds the minimum mileage rental revenue provided herein, and to the extent of other for hire rental revenue during periods of lay-off.

"The carrier may, at its option, provide a minimum guarantee of 26,000 pounds for single axle tractors in lieu of the minimum monthly guarantee provided herein.

"Nothing herein shall apply to leased equipment not owned by the driver.

"The minimum rates set forth above result from the joint determination of the parties that such rates represent only the actual cost of operating such equipment. The parties have not attempted to negotiate a profit for the owner-driver.

"*Section 13.*

"Driver-owner mileage scale does not include use of equipment for pickup or delivery at point of origin terminal or at point of destination terminal, but shall be subject to negotiations between the local union and company. Such negotiations shall be only for the purpose of protecting the wage rate of the driver only as an employee. Failure to agree shall be submitted to the grievance procedure.

"*Section 14.*

"There shall be no reductions where the present basis of payment is higher than the minimum established herein for this type of operation. Where Owner-Operator is paid on a percentage or tonnage basis and the operating company reduces its tariff, the percentage or tonnage basis of payment shall be automatically adjusted so that the Owner-Operator suffers no reduction in equipment rental or wages, or both.

"*Section 15.*

"It is further understood and agreed that any arrangements which have heretofore been entered into between members of this Union, either among themselves or with the Employer or with the aid of the Employer, applicable to owner-driver equipment contrary to the terms hereof, shall be dissolved or modified within thirty (30) days after the signing of this Agreement so that such arrangements shall apply only to equipment of the owner-driver while being driven by such owner-driver. In the event that the parties cannot agree on a method of dissolution or modification of such arrangement to make the same conform to this Agreement, the question of dissolution or modification shall be submitted to arbitration, each party to select one

member of the Arbitration Board, and the two so selected to choose a third member of said Board. If the two cannot agree upon the third within five (5) days, he shall be appointed by the Joint Area Committee. The decision of said Board is to be final and binding.

*"Section 16.*

"It is further agreed that the intent of this clause and this entire Agreement is to assure the payment of the Union scale of wages as provided in this Agreement and to prohibit the making and carrying out of any plan, scheme or device to circumvent or defeat the payment of wage scales provided in this Agreement. This clause is intended to prevent the continuation of or formation of combinations or corporations or so-called lease of fleet arrangement whereby the driver is required to and does periodically pay losses sustained by the corporation or fleet arrangement, or is required to accept less than the actual cost of the running of his equipment, thus, in fact, reducing his scale of pay.

*"Section 17.*

"It is further agreed that if the Employer or certificated or permitted carrier requires that the 'driver-owner-operator' sell his equipment to the Employer or certificated or permitted carrier, directly or indirectly, the 'driver-owner-operator' shall be paid the fair true value of such equipment. Copies of the instruments of sale shall be filed with the Union and unless objected to within ten (10) days shall be deemed satisfactory. If any question is raised by the Union as to such value, the same shall be submitted to arbitration, as above set forth, for determination. The decision of the Arbitration Board shall be final and binding.

*"Section 18.*

"It is further agreed that the Employer or certificated or permit-

ted carrier will not devise or put into operation any scheme, whether herein enumerated or not, to defeat the terms of the Agreement, wherein the provisions as to compensation for services on and for use of equipment owned by owner-driver shall be lessened, nor shall any owner-driver lease be cancelled for the purpose of depriving Union employees of employment, and any such complaint that should arise pertaining to such cancellation of lease or violation under this section shall be subject to Article 7.

*"Section 19.*

"(A) The use of individual Owner-Operators shall be permitted by all certificated or permitted carriers who will agree to submit all grievances pertaining to Owner-Operators to the Joint Area Committee. It is understood and agreed that all such grievances will be promptly heard and decided with the specific purpose in mind of:

"(1) Protecting provisions of the Union contract;

"(2) Prohibiting any and all violations directly or indirectly of contract provisions relating to the proper use of individual owners;

"(3) Prohibiting any attempts by any certificated or permitted carrier in changing his operation which will affect the rights of drivers under the terms of the contract, and generally the certificated or permitted carriers agree to assume responsibility in policing and doing everything within their power to eliminate all alleged abuses in the use of owner-drivers which resulted in the insertion of Section 19 (Article 33) in the original 1945–47 central states over-the-road contract;

"(4) Owner-driver operations to be terminal to terminal, ex-

cept where no local employees to make such deliveries or otherwise agreed to in this contract;

"(5) The certificated or permitted carriers agree that they will, with a joint meeting of the Unions, set up uniform rules and practices under which all such cases will be heard;

"(6) It shall be considered a violation of the contract should any operator deduct from rental of equipment the increases provided for by the 1963 amendments or put into effect any means of evasion to circumvent actual payment of increases agreed upon effective for the period starting January 1, 1963, and ending August 31, 1964.

"(B) No Owner-Operator shall be permitted to drive or hold seniority where he owns three or more pieces of leased equipment. This provision shall not apply to present Owner-Operators having three or more pieces of equipment under lease agreement, but such Owner-Operator shall not be permitted to put additional equipment in service so long as he engages in work covered by this Agreement or holds seniority. Where such Owner-Operator drives he can hold seniority where he works sixty (60) percent or more of time.

"*Section 20.*

"All leases, agreements, or arrangements between carriers and Owner-Operators shall contain the following statement:

"The equipment which is the subject of this lease shall be driven by an employee of the lessee at all times that it is in the service of the lessee.

"If the lessor is hired as an employee to drive such equipment he shall receive as rental compensation for the use of such equipment no less than the minimum rental rates, allowances, and conditions (or the equivalent thereof as approved by the Joint Area Committee), established by this Agreement for this type of equipment, and in addition thereto, the full wage rate and supplementary allowances for drivers (or the equivalent thereof as approved by the Joint Area Committee).

"To the extent that any provision of this lease may conflict with the provisions of this Agreement as it applies to equipment driven by the owner such provision of this lease shall be null and void and the provisions of such agreement shall prevail."

(e) The aforesaid contract clauses remain in effect.

(f) At the time said contract clauses were entered into, various carrier members of respondent associations, including Taylor Motor Express, Kowalsky Express Service, A. E. F. Transportation, A. Duie Pyle, Moon Carrier, Service Motor Freight, Cross Transportation, Robbins Motor Transportation, Shanahan Transportation, Salem Express, Carrier Cartage, Cline's Express, Kulp & Gordon, Inc., Wilson Freight Forwarding, Ragens Transportation, LoBiondo Brothers, Martella Motor Freight, in addition to employing their direct employees driving company-owned equipment, were in a contractual or lease relationship with owner-operators of leased trucking equipment, and the relationship of such carriers under such contracts or leases was that of independent contractor.

(g) The carriers listed in Finding of Fact 4(f) above, their employees and owner-operators who have leased equipment to them, are engaged in the transportation of steel, heavy machinery, and dry freight, although each is not necessarily engaged in all such forms of transportation.

(h) The collective bargaining agreements between respondent unions and respondent associations, of which the

clauses set out in Finding of Fact 4(d) above are a part, cover the transportation of steel, heavy machinery, and dry freight, and also contain union security clauses which, together with the clauses referred in Finding of Fact 4(d) above, if adhered to, will require that the owner-operator referred to in Finding of Fact 4(f) and (g) above cease to be independent contractors, become employees of the carriers and become members of one of respondent unions as a condition of their continuing to haul freight for such carriers.

(i) Pursuant to the aforesaid contract clauses set out in Finding of Fact 4(d) above respondent associations on behalf of their member employers listed in Finding of Fact 4(f) above have ceased or refrained, and have agreed to cease or refrain, from handling, using, selling, transporting or otherwise dealing in products of other employers, or from doing business with other persons, namely, owner operators of leased equipment who do not comply with the aforesaid contract clauses.

(j) The acts and conduct of respondents set forth in Findings of Fact 4(d), (e), (f), (g), (h) and (i) above, occurring in connection with the operations of member carriers of respondent associations, have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

5. It may fairly be anticipated that, unless enjoined, respondents will continue and repeat the acts and conduct set forth in Findings of Fact 4(d), (e), (f), (h) and (i) above, or similar or like acts and conduct.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter of this proceeding, and under Section 10(l) of the Act is empowered to grant injunctive relief.

2. There is, and petitioner has, reasonable cause to believe that:

(a) Respondent unions are labor organizations within the meaning of Sections 2(5), 8(e) and 10(l) of the Act.

(b) Carrier members of respondent associations are engaged in commerce within the meaning of Sections 2(6) and (7) of the Act.

(c) Respondents have engaged in an unfair labor practice within the meaning of Section 8(e) of the Act, affecting commerce within the meaning of Sections 2 (6) and (7) of the Act, and a continuation of this unfair labor practice will impair the policies of the Act as set forth in Section 1(b) thereof.

3. To preserve the issues for the orderly determination as provided in the Act, it is appropriate, just and proper that, pending the final disposition of the matters herein involved pending before the Board, respondents, their officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them, be enjoined and restrained from the commission, continuation, or repetition, of the acts and conduct set forth in Findings of Fact 4(d), (e), (f), (h), and (i) above, acts and conduct in furtherance or support thereof, or like related acts or conduct the commission of which in the future is likely or may fairly be anticipated from respondents' acts and conduct in the past.

Paragraph 4 of the stipulation referred to above provides:

"In these proceedings only, and not in the proceedings before the National Labor Relations Board referred to above, the Petitioner seeks injunctive relief against the enforcement of the Union contractual clauses referred to in the Petition only as against those Carriers named in Exhibit I, and only in relation to Owner-Operators who were in such lease and independent contractor relationship with such Carriers at the time of the execution of

the contract, or such Owner-Operators who may be subsequently contracted with, if in such subsequent contracting there is no replacement of existing direct employees of the Carriers."

Accordingly, we enter the following

### ORDER GRANTING TEMPORARY INJUNCTION

This cause came on to be heard upon the verified petition of Bernard Samoff, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of said Board, for a temporary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, pending the final disposition of the matters involved pending before said Board, and upon the issuance of an order to show cause why injunctive relief should not be granted as prayed in said petition. The Court, upon consideration of the pleadings, evidence, briefs, argument of counsel, and the entire record in the case, has made and filed its Findings of Fact and Conclusions of Law, finding and concluding that there is reasonable cause to believe that respondents have engaged in, and are engaging in, acts and conduct in violation of Section 8(e) of said Act, affecting commerce within the meaning of Sections 2(6) and (7) of said Act, and that such acts and conduct will likely be repeated or continued unless enjoined.

Now, therefore, upon the entire record, it is

Ordered, adjudged and decreed that, pending the final disposition of the matters involved pending before the National Labor Relations Board, respondents Local 107, Highway Truck Drivers and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 312, Chauffeurs, Teamsters, and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 331, Chauffeurs, Teamsters and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 384, Truck Drivers, Chauffeurs and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 470, General Teamsters, Chauffeurs and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Local 676, Truck Drivers and Helpers, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Delaware County Labor Relations Association; Delaware Valley Labor Relations Association; Schuylkill Valley Labor Relations Association; Private Carriers Association; Local Cartage Operators Association; South Jersey Transport Association, Inc.; their officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them, be and they hereby are, enjoined and restrained from:

(a) Maintaining, giving effect to, or enforcing Article 23 of the Local Cartage agreement, Article 24 of the Over-the-Road agreement, or Article 1, Section 2 (c) of either said agreements entered into by respondent unions and respondent associations on or about May 21, 1963, as against the following carrier members of respondent associations: Taylor Motor Express, Kowalsky Express Service, A. E. F. Transportation, A. Duie Pyle, Moon Carrier, Service Motor Freight, Cross Transportation, Robbins Motor Transportation, Shanahan Transportation, Salem Express, Carrier Cartage, Cline's Express, Kulp & Gordon, Inc., Wilson Freight Forwarding, Ragens Transportation, LoBiondo Brothers, Martella Motor Freight, in relation to Owner-Operators who were in such lease and independent contractor relationship with such Carriers at the time of the execution of the contract, or such Owner-Operators who may be subsequently contracted with, if in such subsequent contracting there is no replacement of existing direct employees of the Carriers.

(b) Entering into, maintaining, giving effect to, or enforcing any other contracts or agreements, express or implied,

whereby respondent associations on behalf of their member employers cease or refrain, or agree to cease or refrain, from handling, using, selling, transporting, or otherwise dealing in any of the products of any other employer, or from doing business with any other person, so far as such other contracts or agreements relate to the following carrier members of respondent associations: Taylor Motor Express, Kowalsky Express Service, A. E. F. Transportation, A. Duie Pyle, Moon Carrier, Service Motor Freight, Cross Transportation, Robbins Motor Transportation, Shanahan Transportation, Salem Express, Carrier Cartage, Cline's Express, Kulp & Gordon, Inc., Wilson Freight Forwarding, Ragens Transportation, LoBiondo Brothers, Martella Motor Freight, in relation to Owner-Operators who were in such lease and independent contractor relationship with such Carriers at the time of the execution of the existing contract, or such Owner-Operators who may be subsequently contracted with, if in such subsequent contracting there is no replacement of existing direct employees of the Carriers.